Randy Lowne appearing for Ms. Shepard, the appellant. I'd ask to reserve four minutes for rebuttal. This is a case that arises out of a summary judgment in the district court in regards to an employment case. Ms. Shepard, who was an employee at the Bremerton Naval Hospital as a medical clerk in general surgery, had a difficulty with her supervisor, who was a registered nurse, Linda Ungren. They had a bad relationship. There were reports of yelling at Ms. Shepard in front of both patients and other employees regarding placing blame on Ms. Shepard for things others had done, trying to assign her work at the end of a shift, embarrassing and humiliating her in front of other people. As a result, in September of 2003, she filed an EEO complaint and a hostile work environment complaint, as well as an OWCP claim for stress. Subsequently, there was an investigation by the agency, which found that there was an extremely hostile working environment. The captain in charge ordered that Ms. Ungren no longer supervise Ms. Shepard and at that point attempted to deal with the matter in that fashion. Now, Ms. Shepard had had a carpal tunnel problem at work. She'd had surgery on it. She had permanent limitations in her file, and she had tried to transfer out of general surgery where she was working with Ms. Ungren to get into another department within the Naval Hospital field or at another command. Her attempts to transfer were met with no success, and she believed that she had a problem with Mr. Hickman, who was the HR specialist in charge of HR. Mr. Hickman had suggested that she go into outpatient records, and she advised Mr. Hickman that she had difficulty with that because of her carpal tunnel prior history and that she was not able to do that. Subsequently, one captain left. Captain Rice took over. When Captain Rice took over, there was a determination made that Ms. Ungren's job duties had been changed inappropriately. They were returned, and she was again placed in charge of Ms. Shepard. I think we're familiar with the background facts. The district court projected this claim based on a failure to exhaust and time-bar considerations and so forth. The time-bar consideration is based on a December 28, 2003 transfer, which my client filed her action with EEO on February the 18th, I believe, or February the 14th. In any event, the court found that it was 52 days after the transfer. However, if one looks at document number one in the supplemental record put up by the defense, which is the actual transfer document and the change in her position, one will see that although at the top of the document it indicates that on December 28th is when the transfer occurred, the document doing the transfer wasn't approved until nine days later, which was the 6th of January, 2004, which is at the bottom of that document, approximately the middle of the page. In fact, the document which officially transferred her to the position was signed some 44 days prior to her EEO complaint. In order to file an EEO complaint, you have to show what the action taken was, and the approval on that document wasn't done until the 6th of January, so it was done within 45 days. Additionally, we argued to the court that the action should have been told or stayed equitably, and the reason being that Ms. Shepard was told this was a temporary transfer, not a permanent. In fact, if one looks at the investigation report that is in the record in regards to the hostile work environment, one will see that they documented at, this is in tab 5 of our submission, page 8 of 35, section 5 in the command investigation. It says, with regard to the recommendations 5 through 7, I have requested the director of special services and the department head general surgery clinic coordinate with HRO to detail Ms. Detail, in military jargon, is a temporary assignment. It's a detail. It is not a permanent transfer. Ms. Shepard filed her action, I believe, within four days of learning that it had been made a permanent transfer. She had been told it was a temporary transfer. But she had gotten some verification, hadn't she, that, no, it's permanent, but that doesn't preclude you from applying for other positions. Sort of, and I say sort of because in actuality what he said was, it's permanent in the effect that we're not going to return you to general surgery. He didn't say it was an immediate permanent transfer. And it was known the reason they were moving her out of general surgery is because of the hostile work environment and the harassment that she suffered that was so severe it was found to be an occupational injury by OWCP. And she was approved for treatment, for psychiatric treatment as a result of that. That doesn't happen often. This was severe. It was horrific. And it was continuous. And Mr. Hickman, she had told Mr. Hickman that she had had carpal tunnel and that a transfer into outpatient services wouldn't work because of the lifting requirements, the moving of the heavy files, the things that were required within that department. And, in fact, there was another witness with whom she worked who was actually present when she told Mr. Hickman that in January of 2003, a year before she was transferred, and that she had told him that she had had this carpal tunnel syndrome. And it's referred to in the Ms. Carner's, C-A-R-N-E-R, declaration, which is an attachment to C-R. I swear. Your Honor, I turned it off. I swear. I don't know what happened. Go ahead. Katie Carmer, C-R-15, page 25 of 89. And she said that she heard Ms. Shepard tell Mr. Hickman about the carpal tunnel syndrome, referred to as CTS, and when there was a discussion about her going to outpatient records. Even the person who was going to be your supervisor in outpatient records did a declaration, a statement during the investigation, that when he asked Mr. Hickman about it, he was told it was a temporary placement to get her out of general surgery. He went on to also say that he asked specifically whether or not she had received any medical conditions or anything that would affect her ability to work there. And Mr. Hickman told her no, which was not truthful. So, Your Honor, I believe that there was, one, a basis for a delay in this matter because they misled my client to believe this was a temporary position until they got her a transfer elsewhere. And, two, that based on their own documentation, the transfer wasn't actually approved until January 6th. And as a result, her complaint was within 45 days of the transfer. About a minute and a half left. Do you want to reserve? I would like to reserve, if I may. Good morning. May it please the Court, Counsel. My name is Janie Midditt. I'm an assistant United States attorney appearing on behalf of the government. Ms. Shepard, as Counsel has indicated, was a medical support assistant at the Naval Hospital in Bremerton. She claims that she was retaliated against and discriminated against when she voluntarily accepted a lateral transfer from the general surgery department to the outpatient records department. I believe Judge Fletcher has a question. Would you address first the question of when the transfer was effective? The transfer was effective on December 28th of 2003. That is the effective date. Is it at that time when she physically moves over or when it's officially documented? No, it's at that time when she officially moves over. That's when her transfer is effective. She was aware of the transfer before. She accepted the transfer before. December 28th is when it's cut for payroll records, and that's when her transfer is effective. And where is that in the record? We know that the document says the effective date is the 28th. The approval date is the 5th, I believe. Where is the explanation in the record that that's when it's effective, that that's the relevant date? There is nothing else on the record, Your Honor, other than the documentation itself. I think counsel said it was the 6th. It looks to me like it's the 5th. If that's the effective date, if the approval date is a relevant date, then she's within 45 days? If the approval date is the relevant date. Is she within the 45 days? Do you agree? I'm not 100 percent positive without counting it, but there probably is a good chance that she would be timely if that was the case. However, Your Honor, What is the meaning of approval date on the form? I'm not 100 percent positive myself. It's just a technicality with the human resource people and the admin people putting it down. What if it's disapproved? Excuse me? What if it's disapproved? I can't answer that. I've never seen that happen. When it's indicated that the effective date is something, that means it's approved, and that's the date that is usually in play. Would she have received a copy of this in the normal court? Would she have received a copy of this document? Yes, she would have, Your Honor. And would she have received that? She would have received a copy at the time that After it was approved? Well, she would have received a copy. It's hard to say exactly when it would have gotten to her. It most likely would have gotten to her, well, I really can't answer that. I'm not sure exactly at what point she would have gotten it. She would definitely have gotten it, but it would depend on the human resource department and the admin department how fast they were in getting it to her. It's possible. The record doesn't, that's not in the record. The record, it is not in the record when she received it. She clearly would have received it, and she would have received it within a few days afterwards. How do you know that? She would have received it before she filed her EEO complaint. You assume. You don't know. That is correct, just from knowledge of federal process. Okay. And then, Your Honor, the threshold problem with her complaint, it's our position that she failed to timely exhaust her administrative remedies, and it was on this basis that Judge Layton properly dismissed her case. Ms. Shepard doesn't deny that she did not file within the 45 days. Her argument was not that she was timely within the time that it was approved. Her argument was that she should be excused from the time requirements because she was tricked into believing that the transfer was temporary and that the time limit should be tolled. In essence, she's conflating tolling and estoppel argument, and in this case there's no reason to apply tolling or to apply estoppel. Ms. Shepard, in this regard, was engaging in revisionist history. This response that she was tricked did not come up until she was responding to the summary judgment motion. In her EEO complaint, Ms. Shepard indicated that the discriminatory act was when she was reassigned from the general surgery department to the outpatient records department and that it was at that point that she was discriminated against. She did not say that at some point after she was reassigned, but before she filed her EEO complaint, at some point she all of a sudden was told or found out that a temporary assignment was going to be made permanent. In fact, she's never come up with any time period or any indication of when she had an epiphany that somehow this was no longer a temporary assignment and it had become permanent. This was raised to the EEOC, and there was a hearing. Well, there was not a hearing. There was a decision. The EEOC judge made a decision on the record. But at that time, Ms. Shepard did not address the issue of timeliness which was raised. She did not raise the issue that somehow she had been tricked. This came afterwards. And in any event, the record, the objective record in this case shows that she wasn't tricked. It was clear at the time that she was reassigned that this was going to be a permanent reassignment. The e-mail that was sent to her in which she acknowledges that she received, it's dated December 11, 2003, says, Lana, if we were to make a move of this type, it would be permanent in the sense that you could not return to general surgery. On the other hand, it would not be permanent in the sense that if you applied for and were selected for another position at the SARP or an internal medicine, you could move to that position. It was clear that at that point anything else was going to have to come from her. And to put this in context, Your Honors, the record shows in their e-mails going back and forth showing that Ms. Shepard had been trying for quite a while to get out of the general surgery department. She had been applying to various open positions, and the human resource person, Mr. Hickman, as is indicated in the e-mails, was trying to help her to the best he could. A lot of the places where she was applying were not under the control of the Naval Hospital. In particular, she wished to go to the Puget Sound Naval Shipyard because her husband was working there and she wanted to commute with him. However, the people at the Naval Hospital have no control over hiring there. They could not assign her to the Puget Sound Naval Shipyard. So yes, in a sense, Ms. Shepard might have considered this assignment to be temporary because she knew that she didn't want to stay there, that she had aspirations to go elsewhere. But it was clear that there was nothing that management at the Naval Hospital was going to do. There was no indication from them that they were going to somehow just put her here for a period of time and then they were going to move her. It was very clear that any movement after that, she was going to have to apply for a position and be accepted for it. So there's absolutely no evidence on the record that she was tricked. There's no reason to apply tolling or estoppel in this case. But in any event, if your honors find that there is a question as to the issue of timeliness, excuse me, I have a cold, and wish to go beyond that, when you look at this particular case, there is absolutely no evidence of retaliation or of disability discrimination. Ms. Shepard can't make even a prima facie case on either of those two issues. So although the district court did not go beyond, Judge Layton wrote a very reasoned opinion on the issue of failure to exhaust, and he dismissed for that reason. If your honors decide that she has exhausted because of that approval date, if you do not wish to accept the fact that the effective date is the triggering point, looking at this case substantively, it should still be dismissed. She cannot make a prima facie case. I've discussed the length in my brief, and I don't wish to rehash the same arguments here unless your honors have particular questions regarding the retaliation or the disability discrimination. I think we have your argument in hand. Any further questions? No. Thank you for your argument, counsel. Thank you. Amendment 20. Your honor, I won't take that. I just wanted to acknowledge to the court it was January 5th. I apologize for the statement. I don't think it makes a difference to the calculation, though, does it? My calculation still makes it 44 days to having filed so that it was a timely filing. And on the issue of tolling, even the judge in his decision clearly showed that he was troubled by the fact that both her direct supervisor and her supervisor above her both indicated there was at least some impression that she was only being temporarily assigned there. And if it isn't a permanent assignment, there would be no EEO action to file because without a permanent assignment, the employer has a right to move anybody anywhere temporarily to serve the benefit of the service. So it was the fact that it was a permanent assignment that made this a matter to proceed on. Thank you. Thank you, counsel. Thank you both for your arguments. The case just heard will be submitted for decision. We'll hear arguments on the next case on the calendar, which is United States v. Lippert. Mr. Butler? Good morning. May it please this Court, I'd like to reserve two minutes, please. May it please this Honorable Court, Counsel. My name is Will Butler. I'm an attorney from Harrison, Idaho, and I represent the appellant, Mr. Lippert. Mr. Lippert, Rob, was convicted of six counts, three of mail fraud, three of false statements. In reference to Office of Workers' Compensation benefits for an injury he sustained. Mr. Lippert was injured in 1975, filed for compensation. He was re-evaluated in 1978. It was then designated that he could be a counterperson. He received benefits up until 1984, wherein he disappeared, and benefits were suspended. A check came back to Office of Workers' Compensation. He resurfaced in 1997, reapplied for benefits, and benefits were reinstated in 1999, wherein he received a lump sum in June of 1999 for the time that he had been disappeared. In the Workers' Compensation, individuals once a year are mailed by the Office of Workers' Compensation a Form 1032. And on that 1032, you fill out various questions in reference to your working over the past year. Now, in this particular case, Counts 1 and 4 are related. Counts 2 and 5 are related. And Counts 3 and 6 are related, in that the false statements that were alleged in Mr. Lippert were convicted of in Count 4 relates to Count 1. Count 5 relates to Count 2. Count 6 relates to Count 3. It is our position that the forms are mailed in the birth month. In Mr. Lippert's case, that is in July. So the form in Count 1 was mailed on July 1st by Office of Workers' Compensation to Mr. Lippert, the 1032 that he's requested to fill out. That 1032 at the time is blank. And it's mailed on July 1st to him, asking him to fill it out. The 1032 was signed by Mr. Lippert on July 6th. The indictment charges the date it was mailed by the Office of Workers' Compensation. That is the date that is in the indictment, and that's the date that the jury came back and found Mr. Lippert guilty of, is the date the Office of Workers' Compensation mailed that form. Did it say on or about? It says on or about. Yes, it does say on or about. It is our position that on or about, when the dates are that close, that you have to be a little bit more specific. The July 1st, and it was signed by Mr. Lippert on July 6th. And so the on or about does not extend to that period of time of the six days. That's our position. Mr. Lippert filled it out and mailed it back to the Office of Workers' Compensation form. It's our position that the record as to count one is completely silent as to why the Workers' Compensation form was mailed. There's nothing in the record that he initiated that mailing of that 1032 on July 1st. And that's our position that Mr. Lippert, the form, when mailed, was blank. There was nothing on it. It was mailed pursuant to a legal duty by the Office of Workers' Compensation, and Mr. Lippert had nothing to do with that mailing. Well, was it cured by the evidence that we conformed to what was shown at trial? Your Honor, it's our position that there is nothing in the record prior to that mailing. The mailing of the January 1st, 2000, 1032, theoretically would be based on the 1032 that they received in 1999. Each 1032 goes back 15 months, a year and a quarter, for what you've been working on, what work you've done. There's nothing in the record to show that Mr. Lippert even filed a 1032 or that he made any false statements prior to that 201032 being filed. Was Mr. Lippert actually receiving benefits over that period, though? Over which period, Your Honor? The period that you've just mentioned, 1999. He reapplied in 1997 and received a lump sum payment. From the record, I'm making that assumption that he received benefits up until 1999 based upon the lump sum payment that was paid for 1984 through 1999, or up until June of 1999. So he's receiving benefits, but there's nothing in the record to show that he made any false statements at all. The record is devoid of anything to support that allegation. But when the July 1, 2002 form was sent to him, mailed to him, wasn't he receiving benefits? He was receiving benefits on July 1, 2002, and that's count three. And that form and also count two were mailed on July 1. 2001. And from the record, the workers' compensation did not receive that 1032 from 2001. And so they re-mailed that form on October 11 of 2002 along with the 2002 1032. But my question is really directed at his status as a beneficiary of the program during this period. He was receiving benefits. Yes, so did that fact trigger the mailings? The fact that he's receiving benefits triggers the mailings. But the 2000 1032, there's nothing going back behind that to indicate that Mr. Lippard asked that that be sent for the first, for count one. In count two, the 2001, there would be the prior, the count one, the count five 1032, no, excuse me, the count four 1032 that he made a false statement would support the mailing of the count three, of the count two would support that. But you get to the count three mailing, they did not receive the prior year's 1032 until after the 1032 for 2002 was mailed. So the workers' compensation has been mailing these forms just automatically mailing them. And the government's position is that Mr. Lippard has done something affirmative to get these mailings. And the forms themselves, there's nothing illegal about the forms themselves. It's the allegations are and what Mr. Lippard was convicted of in counts four, five, and six was the false statements. But the forms when they're mailed are completely blank. There's no information on them. And they're mailed purely because he's on the roles of the Office of Workers' Compensation. And that's the only reason they're mailed. You have about two minutes left. Do you want to reserve? Thank you. But we would like to reserve that. We would ask the court to overturn the convictions of count one, two, and three of not supported by the evidence. And also as to count six, as there's nothing in the record to support the jury finding on count six. Thank you. Thank you, counsel. Ms. Hargrove. May it please the court, my name is Serena Case Hargrove, and I represent the United States in this matter. I'm going to jump right in and start discussing count one, which is definitely the trickiest issue for the government, precisely what counsel has just raised, and that is that there is no direct evidence on the record of Mr. Lippert's inducement of the 2000 form to be sent. The government tried to introduce Mr. Lippert's 1997 letter in which he sought to have his benefits reinstated, and that piece of evidence was excluded. What we do have in the record, however, is testimony from a government witness, Ms. McDonald, who is from the Office of Workers' Compensation Program. And from her testimony, reasonable inferences about Mr. Lippert's prior behavior may be drawn. Ms. McDonald testified that in 2000, when Mr. Lippert submitted his 1032 saying that he couldn't work at all, that he hadn't worked at all in the last 15 months, that the action OWCP took was nothing. They maintained the status quo. He was allowed to receive the same amount of benefits he'd been receiving before. And from that and the fact that we know he was reinstated in 1999, there's a reasonable inference that may be drawn that he was presenting the same information to the Office of Workers' Compensation. But the appellant's counsel is correct. It's a bit of a stretch. Pardon? It's a bit of a stretch. Sadly, it is not direct evidence, yes. What happens if we throw out count one? Does that impact the sentence at all? Unlikely to, no, because count four, which corresponds to count one, is false statement to the government on that same 1032 that was mailed in 2000. And the amount of loss is precisely the same. Okay. After 2000, Mr. Lippert had, it's on the record, I should say, that Mr. Lippert had assumed the affirmative duty of informing OWCP of any work that he did. You're not supposed to just wait until the next year when the form is mailed. If you begin to work or if you're working, you're supposed to tell OWCP that. And that's specifically listed on the 1032, the last page that he signed. And so after that, if he had indeed told the truth and come forward and said, I have been working, or I made a mistake in the last form, or I lied in the last form, at that point they would have instituted an investigation. And it's unlikely that they would have sent out another 1032. And so after 2000, the 2001 1032, which is count two, clearly was induced by Mr. Lippert. There's a much stronger explanation for that. Count three is interesting. Ms. McDonald testified that after 2001, OWCP went to a new procedure in which all of the forms had to be mailed by the applicants. And so whereas the government charged the government's mailing in 2000 and 2001, the date on count three is in November. And there's testimony in the record, again from Ms. McDonald from the file, explaining that OWCP received Mr. Lippert's 1032 in 2002 on November 14th. The date for mailing charged on count three is November 11th, on or about November 11th, which is approximately what you would expect for someone to mail the document. So count three actually did charge Mr. Lippert's mailing to the government. It's worth noting that here, it's a small point, but I think it's worth noting, that here the mailing is not a jurisdictional issue the way that it was in PAR. It is an element of the crime, to be sure. But this is not a case in which all of the charges were catapulted into federal jurisdiction, out of state jurisdiction, as in PAR. It's more akin to maize, in which there were federal charges. And we're just looking at this, at the mail fraud count, as an element, the mailing as an element in the charge. If you have any further questions, I'm happy to answer them. Thank you. I think we understand you have your argument in hand. So thank you very much for your presentation. Thank you. Thank you, Your Honors. As to count three, the testimony at trial was that the 1032, the form, was mailed on October 11th, 2002, and that the form on the indictment charges the October 11th. So the dates are wrong. It's charged October 11th. The testimony, the indictment says November 11th. Testimony at trial says October 11th. Mr. Lippert signed that form on October 14th. The testimony at trial is that the workers' compensation received it on November 18th of 2002. We're making an assumption. The record is devoid on count one, count two. I have a little bit more problem with, because there's the prior year's form that supports the count two. Count three is not supported by the evidence in that the prior year form was not received by the workers' compensation until the subsequent year's 1032 was formed. So there's nothing behind those two in the third count to support the third count because they did not receive the form. We would ask the court to overturn the convictions of the first three counts in that Mr. Lippert did not induce sending of those forms, and when those forms were sent as in par, they were blank. They were pure as the driven snow. There was nothing on the forms, and they were not illegal at the time. We would ask the court to hold that they were not illegal and that Mr. Lippert did not induce the sending of those forms. Thank you. Thank you, counsel. The case just heard will be submitted for decision.
judges: B. Fletcher, Thomas, Cjj Conlon (N. Ill.), Dj